# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Valhalla Partners II, L.P., James J. Pallotta, Great Oaks Venture Fund LP, Scott Becker, Advancit Capital I, LP, Eniac Ventures II, L.P., Eniac Ventures, L.P., DFJ Mercury II, L.P., DFJ Mercury II Affiliates Fund, L.P., Occam's Razor, LLC, Gordon Su, Brent Buntin, Ocean Assets LLC, Draper Associates Riskmasters III, LLC, and Robert Horwitz,<br><br>    Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>Vistar Media, Inc.,<br><br>    Defendant/Counterclaim Plaintiff. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 2019-0202-SG<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Date Submitted: June 25, 2024
Date Decided: December 9, 2024

Steven L. Caponi and Matthew B. Goeller, of K&L GATES LLP, Wilmington, Delaware; OF COUNSEL: Neil T. Smith and Jennifer J. Nagle, of K&L GATES LLP, Boston, Massachusetts, *Attorneys for Plaintiffs / Counterclaim Defendants*

Rudolf Koch and John M. O'Toole, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: A. Matthew Boxer and Rebecca J. Ryan, of LOWENSTEIN SANDLER LLP, New York, New York, *Attorneys for Defendant / Counterclaim Plaintiff*

**GLASSCOCK, Vice Chancellor**

This case involves contracts entered to provide financing for a start-up company. The vehicle used for the purpose was a form of convertible note, negotiated by Plaintiff investor/noteholder Valhalla Partners II, L.P. ("Valhalla") and Defendant, Vistar Media, Inc. ("Vistar"), an advertising technology company. The other Plaintiffs are also noteholders; they adopted the contract negotiated by Valhalla and Vistar.

Plaintiffs are venture capitalists and "angel" investors. Their business model is to invest in start-up companies, including, as here, via convertible notes. Typically, such notes provide that if the company shows initial success and gets to an equity financing round, the notes convert to equity; if the notes mature without an equity financing round, usually that indicates that the business is not a success. In that case, the note is payable, at the face amount together with modest interest, or (if the contract so provides) may convert to equity or provide the option to extend maturity. If the note becomes payable, it is not unusual for this amount to simply provide the investors with a claim in bankruptcy.

On the other hand, if the company is successful and participates in equity financing, the notes convert on favorable terms, and noteholders become equity holders. In other words, the convertible noteholders are engaged in a risky game, in which the investment may well be lost but, conversely, can pay quite handsomely if

the issuer is a success. The noteholders are not banks, and do not anticipate making money on the notes viewed as nominal-interest loans.

Although the scenario above is typical, the terms of the convertible notes are bespoke. Here, Vistar sold a first round of convertible notes in January and February of 2012 (the "First Round Notes")—largely to "friends and family"—on terms that provided that at maturity the First Round Notes would "convert into shares of common stock" of Vistar.[1] Needing more financing, and not wanting to engage in equity financing, Vistar approached investors to buy a second round of convertible notes in late 2012 and during 2013. A negotiation with Valhalla resulted. Vistar at first offered notes with the same terms as in the First Round Notes. Valhalla rejected those terms, and sought notes that provided a noteholder with the discretion at maturity "to be repaid or extend the maturity."[2] In response, Vistar provided a draft of the notes to Valhalla that Vistar said "included the changes requested" by Valhalla.[3] In fact, the draft actually reflected a counter-offer for notes that at maturity "will, at the discretion of the [noteholder], be repaid in full or convert into shares of common stock."[4] Valhalla then proposed a final draft where it "cleaned

---

[1] JX72 at 0003. The conversion to common stock would be "at a price per share equal to a pre-money valuation equal to $5.0 million." *Id.*

[2] JX163 at 0001.

[3] JX184 at 0001.

[4] *Id*. at 0013. The conversion to common stock would be "at a price per share equal to a pre-money valuation equal to $6.0 million." *Id.* This counter proposal also provided for the possibility of automatic conversion to equity at maturity; if a "Non-Qualified Financing" had occurred prior to

2

up some of the language"[5] in Vistar's draft  The proposed terms of this final draft were accepted by Vistar, and adopted by the other Plaintiff noteholders.  Those terms provided that "[s]ubject to the provisions related to the conversion of this Note, the outstanding principal balance of this Note[], together with interest accrued and unpaid to date shall be payable the earlier of (x) the Maturity Date, (y) a Sale (as defined [therein]) or (z) an Event of Default (as defined [therein])."[6]  In terms of conversion provisions, the terms provided for automatic conversion to equity in the event of a "Qualified Financing"[7] and a noteholder option to convert in the event of a "Non-Qualified Financing."[8]

Vistar proved to be that unusual start-up that was sufficiently successful that it did not need to do an equity financing round.  The second round of convertible notes were issued in 2012 and 2013 (the "Second Round Notes") and were amended (meeting the contractually-mandated requirements for amendments) twice, to extend the term of the Second Round Notes.  Finally, and pursuant to those amendments,

---

maturity but the noteholder had not at that time executed its option to convert, then such conversion would occur at maturity. *Id.*

[5] JX185 at 0001.

[6] *E.g.*, JX195 at 0001 ("Note").  As stipulated by the parties, each Second Round Note was identical in all respects with the exception of the date, identity of the holder, and the principal amount. PTO ¶ 57.  This is the Second Round Note issued to Plaintiff Becker, pending his execution. *See* Note. The "Maturity Date" was defined as September 30, 2014. *Id.*

[7] A "Qualified Financing" was defined as "a sale of convertible preferred stock of [Vistar] with immediately available gross cash proceeds to [Vistar] of at least $2,000,000." *Id.*

[8] *Id.*  A "Non-Qualified Financing" was defined as a "sale of convertible preferred stock of [Vistar] with immediately available gross cash proceeds to [Vistar] of less than $2,000,000." *Id.* at 0002.

3

the Second Round Notes matured on March 31, 2016. Since no Qualified Financing, Sale or Event of Default had taken place, the Second Round Notes by their terms were thereafter "payable." The Second Round Notes did not provide Plaintiffs a unilateral right to extend the maturity date, nor (unlike the First Round Notes) did they provide for automatic conversion to common stock, which Valhalla had specifically rejected as a term. Indeed, Valhalla, in the final version of the Second Round Notes, removed language from Vistar's draft that at maturity gave a holder of Second Round Notes an option; to convert to common stock or receive repayment, at the holder's discretion. Thus, facially, the Second Round Notes required repayment at maturity. Plaintiffs did not demand repayment at the end of the term, however.

Eventually, in 2017, Vistar tendered repayment, at the face amount of the notes together with the prescribed interest, at 4%. Plaintiffs refused the tender, contending that they were entitled to hold the notes until a Qualified Financing occurred. Plaintiffs allege that a Qualified Financing occurred four years later, in July 2021.

Plaintiffs seek a declaratory judgement that their rights to convert persisted until that time. They seek enforcement of the contract, thus interpreted. Vistar points out that the maturity date was extended twice, but without a Qualified Financing, and contends that as of March 31, 2016, each Second Round Note was

4

"payable," meaning the noteholders rights were limited at that point to repayment with interest. Vistar has counterclaimed for breach of contract, arguing that in not accepting repayment, Plaintiffs breached the Second Round Notes, impairing Vistar's ability to borrow money.

On the parties' Cross Motions for Summary Judgment, I found ambiguity to lurk in the phrase "payable," finding Vistar's reading (confining Plaintiffs' rights at maturity to repayment) plausible but that the language was not inconsistent with Plaintiffs' insistence that the Second Round Notes provided them an option other than to receive repayment, consistent with Plaintiffs description of their business model.[9] I then held a trial, at which the parties presented extrinsic evidence on the meaning of the Second Round Notes. This is my post-trial opinion on the contract issues.

The extrinsic evidence, to my mind, was not decisive. The contracting history was not instructive—it reveals primarily that Vistar offered Valhalla an option to convert to common stock or receive repayment at maturity. This Valhalla removed in the final draft, which was then entered as the contract between the parties. Plaintiffs suggest that omitting the option was a scrivener's error, but they do not seek a construction that would restore that option—instead, they seek to impose an option to unilaterally extend the Second Round Notes until a Qualified Financing

---

[9] *See* Tr. of 9-19-23 Oral Arg. on Mot. for Summ. J. 65:6–68:9, Dkt. No. 245.

should occur. This the drafting history does not support, I find. Plaintiffs also put in evidence as to course of trade, but this is not helpful, since the language in question was specifically negotiated by Valhalla and Vistar, and drafted by Valhalla. I therefore give the language its most obvious meaning. Plaintiffs had conversion rights before the maturity date, if certain occurrences in fact happened. Those occurrences did not happen before maturity, and the Second Round Notes became payable. Plaintiffs are entitled to payment of the face amount together with interest, which is the result they bargained for. That a different result comports better with Plaintiffs' business model, or that Valhalla wishes it had provided different contractual language, is not controlling here.

Meanwhile, Plaintiffs' actions here—seeking relief in litigation rather than accepting Vistar's tender—does not, under the contract as I read it, amount to an actionable breach. Accordingly, no parties' claim for breach of contract prevails.

I confess that this decision is difficult for a judge in equity. Generally speaking, Plaintiffs' business model is to invest in risky start-ups, then attempt to help the start-up become successful. If they invest through convertible notes and the issuer succeeds, the noteholder is rewarded with equity; should the issuer fail, the noteholders are simply debtors. Here, the issuer was successful, but enforcing the contract as written results in the noteholders receiving only repayment at nominal interest. Plaintiffs insist that interpreting the Second Round Notes to avoid this result

6

is "right and equitable."[10]  It is not contractual, however, even reading the contract as a whole and in light of the extrinsic evidence.

Delaware, as our courts often point out, is contractarian.  That is because enforcing contracts as written—holding counterparties to their bargain—is of substantial benefit to society in general.  Here, Plaintiffs wish they had entered a contract more favorable to themselves, but they are held instead to the contract they entered.

Still remaining are certain equitable claims for relief arising from Vistar's conduct during the term of the Second Round Notes.  The parties should inform me of what issues remain for decision in light of the contractual result here.

My reasoning follows.

---

[10] Pls.' Opening Post-Trial Br. 31, Dkt. No. 292 ("Pls.' Opening Br.").

# I. BACKGROUND[11]

## A. *The Parties*

### 1. Plaintiffs/Counterclaim Defendants

Plaintiff Valhalla is a Delaware limited partnership with its principal place of business in Cabin John, Maryland.[12]

Plaintiff James J. Pallotta is an individual who resides in Massachusetts.[13]

Plaintiff Great Oaks Venture Fund LP ("Great Oaks") is a Delaware limited partnership with its principal place of business in New York, New York.[14]

Plaintiff Scott Becker is an individual who resides in New York.[15]

Plaintiff Advancit Capital I, LP ("Advancit") is a Delaware limited partnership with its principal place of business in Norwood, Massachusetts.[16]

---

[11] Citations to the parties' joint trial exhibits are referred to by the numbers provided by the parties and cited as "JX__". *See* Pre-Trial Stipulation and [Proposed] Ord., Ex. A, Dkt. No. 260. Citations to the parties' stipulated pre-trial order are cited as "PTO ¶ __". Pre-Trial Stipulation and [Proposed] Ord., *amended by* Tr. of 2-28-2024 Tel. Pretrial Conference and Ruling of the Ct. on Mots. in Lim., Dkt. No. 283. References to the trial transcripts are cited as "Tr. (WITNESS NAME) __:__". Tr. of 3-4-2024 Trial — Volume I, Dkt. No. 286; Tr. of 3-5-2024 Trial — Volume II, Dkt. No. 287; Tr. of 3-6-2024 Trial — Volume III, Dkt. No. 288; Tr. of 3-7-2024 Trial — Volume IV, Dkt. No. 289.

[12] PTO ¶ 31.

[13] *Id.* ¶ 32.

[14] *Id.* ¶ 33.

[15] *Id.* ¶ 34.

[16] *Id.* ¶ 35.

Plaintiffs Eniac Ventures II, L.P. ("Eniac II") and Eniac Ventures, L.P. ("Eniac I", together with Eniac II, "Eniac") are each a Delaware limited partnership with their principal places of business in San Francisco, California.[17]

Plaintiffs DFJ Mercury II, L.P. ("DFJ Mercury II"), DFJ Mercury II Affiliates Fund, L.P. ("DFJ Mercury Aff.", together with DFJ Mercury II, "DFJ Mercury") are Delaware limited partnerships with their principal places of business in Houston, Texas.[18]

Plaintiff Draper Associates Riskmasters III, LLC ("Draper") is a Delaware limited liability company with its principal place of business in California.[19]

Plaintiff Occam's Razor, LLC ("Occam") is a Delaware limited liability company with its principal place of business in New York, New York.[20]

Plaintiff Gordon Su is an individual who resides in California.[21]

Plaintiff Brent Buntin is an individual who resides in New Jersey.[22]

Plaintiff Ocean Assets LLC ("Ocean Assets") is a Maryland limited liability company with its principal place of business in Bel Air, Maryland.[23]

---

[17] *Id.* ¶ 36.
[18] *Id.* ¶ 37.
[19] *Id.* ¶ 38. Draper was a co-investor in the Vistar convertible notes with DFJ Mercury and DFJ Mercury negotiated on Draper's behalf. *Id.*
[20] *Id.* ¶ 39.
[21] *Id.* ¶ 40.
[22] *Id.* ¶ 41.
[23] *Id.* ¶ 42.

Plaintiff Robert Horwitz ("Horwitz") is an individual who resides in New York.[24]

## 2. Defendant/Counterclaim Plaintiff Vistar Media, Inc.

Defendant (and Counterclaim Plaintiff) Vistar is a Delaware corporation principally operating in New York, New York.[25] Vistar was founded in 2012 by Michael Provenzano, Mark Chadwick, and Jeremy Ozen.[26] As described by Provenzano, Vistar "is a software company in the out-of-home advertising space" (for example, billboards and screens found in airports and gas stations) that provides software and services to both buyers and sellers in the marketplace.[27]

Provenzano graduated from college in 2008 and was previously the co-founder of another advertising software company, Invite Media.[28] Provenzano left Invite Media soon after it was sold in 2010 and began working with Ozen on the concept behind Vistar in 2011.[29] Ozen and Provenzano were college classmates and

---

[24] *Id.* ¶ 43.
[25] *Id.* ¶ 45.
[26] *Id.* ¶ 46.
[27] Tr. (Provenzano) 953:18–954:21. More specifically, "Vistar is a technology company that gathers consumer data, such as consumers' physical location and movements, and uses that information to define consumer audiences and thereby help other companies develop digital marketing strategies." PTO ¶ 47.
[28] Tr. (Provenzano) 955:2–15.
[29] *Id.* at 957:1–957:24.

roommates,[30] they were joined by Chadwick who had worked at Invite Media with Provenzano.[31]

### B. *Vistar Issues its First Round of Convertible Notes in Early 2012*

On January 25, 2012, to raise funds to support Vistar's 2012 operations, Vistar reached out to certain individuals by email and solicited their participation in an issuance of Vistar convertible promissory notes.[32]  Vistar attached a term sheet to its email, which included (a) a maturity date for the notes, (b) a simple annual interest rate of four percent per year, (c) automatic conversion of the principal and interest of each note at the maturity date into common stock of Vistar (at a valuation of Vistar of $5 million) and (d) if a financing event that met certain requirements occurred prior to the maturity date, automatic conversion of the principal and interest of each note into the same type of securities sold in such financing (at 80% of the price per share of the securities sold in the financing, with a cap on such price per share based on a valuation of Vistar of $5 million).[33]

On January 31, 2012 and February 29, 2012, Vistar issued the First Round Notes, which had an aggregate principal amount of approximately $500,000 and a maturity date of January 31, 2014.[34]  Among the investors in the First Round Notes

---

[30] *Id.* at 958:23–959:2.
[31] *Id.* at 960:9–16.
[32] *See* JX69 at 0001.
[33] *Id.* at 0002–03.
[34] PTO ¶¶ 48, 52.

11

were Becker (who had co-founded Invite Media with Provenzano)[35] and Great Oaks Venture Capital LLC, the fund manager for Great Oaks[36] (which had invested in Invite Media).[37]

Each of the First Round Notes were identical in all material respects except for principal amounts, holder name, and issue date.[38] The First Round Notes reflected the equity conversion terms from Vistar's January 25, 2012 term sheet, stating, in relevant part, that:

> At the maturity date the [First Round] Note will convert into shares of common stock at a price per share equal to a pre-money valuation equal to $5.0 million.

and upon the closing of "a sale of convertible preferred stock of [Vistar] with immediately available gross proceeds to [Vistar] of at least $2,000,000," the principal and interest of the First Round Notes would automatically convert into shares of the same class and series of Vistar issued in such financing (at 80% of the price per share of the securities sold in such financing, or if less, an amount determined assuming a pre-money valuation of Vistar of $5 million)[39] (together, the "First Round Note Conversion Terms").

---

[35] Tr. (Provenzano) 956:20–24; Tr. (Becker) 600:12–20.
[36] PTO ¶ 48.
[37] Tr. (Boszhardt) 368:3–17.
[38] PTO ¶ 48.
[39] JX72 at 0003; *see also* PTO ¶ 51.

The First Round Notes had a maturity date of January 31, 2014, and did not contain an express provision regarding extending the maturity date.[40] The First Round Notes could be "modified or amended only by a written instrument duly executed by [Vistar] and by the holders of at least a majority of the aggregate amount of outstanding principal under the [First Round] Notes."[41]

### C. Vistar Decides to Raise Additional Funds through a Second Round of Convertible Notes

Vistar sought to raise additional capital during 2012 and initially explored equity financing; by December 2012, it had term sheets from two venture capital firms.[42] However, Vistar was not "happy about the dilution that would have gone into an [equity financing] at that point in time" and Vistar could not agree with the two venture capital firms on a valuation.[43] As a result, Vistar pivoted to "a smaller round with more strategic ad tech investors" and decided to issue another round of convertible promissory notes.[44] Vistar reached out to an initial group of individuals

---

[40] *See* JX72 at 0003–06.

[41] *Id.* at 0004.

[42] Tr. (Provenzano) 969:11–14; JX152 (Valhalla sharing a term sheet for equity financing with Vistar on December 10, 2012); JX157 (DFJ Mercury sharing a term sheet for equity financing with Vistar on December 11, 2012).

[43] Tr. (Provenzano) 969:14–17; *see also* JX160 at 0003 (Vistar writing to Valhalla regarding equity financing proposal from Valhalla: "To be transparent with our thinking, the dilution level given the quantum of money being raised is still tough for us . . . . As such, we are thinking about a smaller ad tech angel round as an alternative financing strategy.").

[44] *See, e.g.*, JX149.

and entities, including certain of Plaintiffs, in December 2012 to solicit their participation in this second round of convertible promissory notes.[45]

At least Plaintiffs Valhalla,[46] Pallotta,[47] Great Oaks,[48] Becker,[49] Advancit,[50] Eniac,[51] DFJ Mercury[52] (who also negotiated on behalf of Draper),[53] Occam,[54] Ocean Assets,[55] and Horwitz[56] make investments in early-stage companies as an investment strategy, in some cases for themselves as individuals (i.e., angel investors)[57] or on behalf of family offices,[58] and in other cases as a business for funds they are tasked with managing (i.e., venture capital firms).[59] As investors in early-

---

[45] *See, e.g.*, *id.* (Vistar soliciting Great Oak's participation in the second round of convertible notes); JX160 at 0002 (Vistar offering Valhalla the opportunity to participate in the second round of convertible promissory notes); JX172 at 0004 (Vistar connecting with a representative of Pallotta on the second round of convertible promissory notes); JX179 at 0002 (Vistar soliciting Becker's participation in the second round of convertible promissory notes).

[46] *See* Tr. (D'Andrea) 5:21–6:11; Tr. (Hebbar) 85:12–86:4.

[47] *See* Tr. (Langsam) 287:9–288:3.

[48] *See* Tr. (Boszhardt) 358:9–23.

[49] *See* Tr. (Becker) 601:22–602:12, 607:6–8.

[50] *See* Tr. (Ostheimer) 1143:2–11, 1145:11–1146:3.

[51] *See* Tr. (Young) 468:15–24.

[52] *See* Tr. (Garrou) 726:5–19.

[53] PTO ¶ 38.

[54] *See* Tr. (Zawadzki) 1091:4–21, 1093:5–22.

[55] *See* Tr. (Lipitz) 436:6–437:6.

[56] *See* Tr. (Horwitz) 230:14–231:4.

[57] *See, e.g.*, Tr. (Becker) 601:23–602:12.

[58] *See, e.g.*, Tr. (Horwitz) 230:5–13; Tr. (Langsam) 286:15–21; Tr. (Lipitz) 436:3–11.

[59] *See, e.g.*, Tr. (D'Andrea) 6:23–7:15; Tr. (Hebbar) 82:7–16; Tr. (Young) 468:15–24. Of the remaining Plaintiffs: (1) Buntin had invested in two start-ups prior to Vistar, but himself worked for a start-up and developed a professional and personal relationship with Provenzano and Ozen from working out of a shared office space with Vistar and (2) Su had attended college with Ozen and Provenzano and was a close friend of Ozen (Su did invest in start-ups, which in most instances were companies that were founded by his friends). *See* Tr. (Buntin) 687:12–688:5, 690:19–697:9; Deposition of Gordon Su (dated June 19, 2021) 22:22–23:5, 27:6–11.

stage companies, these Plaintiffs expect many of the companies they invest in to fail, with the hope that a few companies will be outsized successes that deliver more than offsetting returns.[60] To capture those returns, these Plaintiffs want to hold equity in the successful companies they invest in (as opposed to holding debt, which would typically only return a specified interest rate).[61] One method used by Plaintiffs (other than the direct purchase of equity) is a convertible promissory note, which, in theory, allows an investor to participate in the upside of a successful investment through conversion to equity if certain agreed upon conditions are met (while providing a measure of downside protection through the debt preference over equity if not yet converted in, for example, the event of bankruptcy, to the extent any assets remain).[62] While a convertible promissory note typically includes a cap on the valuation used for converting to equity, it does not set a specific equity valuation for the company, so that a company can raise funds from equity-minded investors, but delay a valuation until a direct equity financing (if one occurs).[63] Vistar knew certain

---

[60] *See, e.g.*, Tr. (D'Andrea) 5:21–6:11; Tr. (Young) 471:17–473:3; Tr. (Becker) 602:4–12, 607:19–608:6; Tr. (Garrou) 726:20–727:15.

[61] *See, e.g.*, Tr. (D'Andrea) 6:12–22, 9:2–7; Tr. (Hebbar) 89:7–18; Tr. (Langsam) 288:4–13; Tr. (Becker) 608:7–17.

[62] *See, e.g.*, Tr. (D'Andrea) 9:8–11:12; Tr. (Horwitz) 231:14–232:11, 232:24–233:10; Tr. (Becker) 604:23–605:17; Tr. (Garrou) 728:4–729:3. Certain Plaintiffs stated that they expect the companies they invest in to use all capital they receive and not have meaningful assets if they fail, and therefore a debt preference in the case of failure may not have significant value. *See* Tr. (Young) 482:1–16.

[63] *See, e.g.*, Tr. (D'Andrea) 10:12–11:12; Tr. (Hebbar) 84:12–85:11; Tr. (Langsam) 290:18–291:5; Tr. (Becker) 604:23–605:17. In late 2013, Y Combinator introduced the "safe" or simple agreement for future equity, a template document designed for start-ups to use to raise funds which, like the Second Round Notes, provides for conversion to equity (with a valuation cap) upon a

Plaintiffs through Provenzano's previous experience or connections as a co-founder of Invite Media (including individuals and entities that had invested in Invite Media)[64] and was introduced to other Plaintiffs because such Plaintiffs were angel investors and venture capitalists who invested in early-stage companies[65] and/or were entities that could provide a strategic advantage to Vistar.[66]

To Plaintiffs that Vistar approached in early- to mid-December 2012, Vistar proposed that its second round of convertible promissory notes would be on the same terms as the First Round Notes (except that the cap on the valuation of Vistar used for purposes of converting to equity would be increased from $5 million to $6 million).[67] Vistar distributed a form of convertible promissory note for the second round, which was based on the First Round Notes,[68] to (a) Eniac on December 9, 2012,[69] (b) Pallotta (who invested in his own name, but reviewed and negotiated the

financing event, but has no expiration or maturity date. *See* Carolynn Levy, *Safe Financing Documents*, https://www.ycombinator.com/documents (last visited Dec. 6, 2024).

[64] For example, Great Oaks. *See* Tr. (Boszhardt) 368:3–369:4.

[65] *See* Tr. (D'Andrea) 17:19–18:2 (describing that Vistar was introduced to Valhalla "as a good investment opportunity"); Tr. (Young) 484:23–485:10 (describing that another venture capitalist introduced Eniac to Vistar); Tr. (Garrou) 736:2–739:15 (describing how representatives of DFJ Mercury and Vistar met through common acquaintances, developed a business friendship, and DFJ Mercury became interested in investing in Vistar).

[66] Both Horwitz and Ocean Assets stated they met Vistar in the context of Vistar seeking to develop a partnership with a company that both Horwitz and Ocean Assets had connections to. *See* Tr. (Horwitz) 284:6–285:1; Tr. (Lipitz) 447:11–448:2.

[67] *See, e.g.*, JX149 (a December 10, 2012 email from Vistar to Becker stating "same documents as the last round but 6m pre money cap").

[68] *See, e.g.*, *id.*; Tr. (Ozen) 849:19–850:2; JX148 at 0001 (Vistar sharing a draft of the second round of convertible promissory notes with Eniac noting that Vistar is "working off the documents from [Vistar's] last round").

[69] JX148.

convertible promissory notes through his family office, the Raptor Group),[70] on December 11, 2012,[71] and (c) Valhalla on December 13, 2012,[72] that, in each case, proposed terms that were the same as the First Round Note Conversion Terms. Aside from Valhalla, there is no indication that Pallotta,[73] Eniac,[74] or any Plaintiff that received this draft objected to or sought to vary the First Round Note Conversion Terms for the second round of convertible promissory notes.[75] To the extent comments were received from Plaintiffs other than Valhalla (whether such Plaintiffs received a version of the second round convertible promissory note that included the First Round Note Conversion Terms or a subsequent version with different terms on

---

[70] Tr. (Langsam) 285:17–22, 286:18–21.
[71] JX156.
[72] JX160.
[73] *See, e.g.*, JX219 (email chain where Vistar and Raptor Group discuss the Second Round Note, Raptor Group requests certain Vistar representations be added and they discuss a debt that Vistar has taken on, but Raptor Group does not mention or ask about the conversion terms).
[74] *See* JX218 (Vistar sharing a draft of the Second Round Note with Eniac on December 29, 2012, Eniac having no comments, except one question related to Valhalla having rights that the rest of the note holders will not have).
[75] For example, Vistar initially reached out to Great Oaks on December 9, 2012 to solicit participation in the second round of convertible promissory notes, with the "same documents as the last round but 6m pre money cap," i.e., containing the First Round Note Conversion Terms. JX149. Vistar followed up on December 22, 2012 and shared a draft of the notes that contained the First Round Note Conversion Terms. JX181. No evidence was presented that Great Oaks commented on or questioned the conversion terms of this draft.

conversion to equity),[76] such comments were primarily limited to the principal amount of the notes and the identity of the purchasing entity.[77]

### D. Vistar Negotiates the Conversion Terms of the Second Round Notes with Valhalla

Valhalla responded to Vistar's December 13, 2012 email—proposing second round convertible notes with terms consistent with the first round—with a list of eight comments on December 17, 2012.[78] Among Valhalla's comments were: (a)

---

[76] Continuing with the example of Great Oaks, Vistar shared a final version of the Second Round Notes with Great Oaks on January 7, 2013, which contained the Second Round Note Conversion Terms (as defined below) rather than the First Round Note Conversion Terms. *See* JX226. After not receiving a reply, Vistar followed up with Great Oaks on January 16, 2013, who in turn asked "who's doing the legal review on the investor side?" JX252. Vistar responded that "investors at [Eniac] used their internal GC to review and sign off." *Id.* After a request to change their investing entity, Great Oaks executed their Second Round Note on February 19, 2013. JX279. No evidence was presented that Great Oaks commented on or questioned the conversion terms of this final version of the Second Round Notes.

[77] For example, DFJ Mercury was provided with a draft of the Second Round Notes on January 7, 2013, which contained the Second Round Note Conversion Terms, and engaged with Vistar on Second Round Notes over several emails. *See* JX223; JX227; JX235; JX244; JX247. There was no evidence presented that DFJ Mercury commented on or questioned the conversion terms of the Second Round Notes, only that it asked about the identity and amounts of other investors and, for its and Draper's Second Round Notes, commented on the specific entity names and principal amounts for each. *See, e.g.*, JX223; JX227; JX235; JX244; JX247. In terms of comments to the Second Round Notes, for example, Raptor Group did ask that Vistar make additional representations about Vistar, which Vistar added and shared with Raptor Group on December 19, 2012. *See* JX170. Vistar also received questions on the Second Round Notes, for example, to clarify or explain certain language, none of which related to the conversion terms. *See, e.g.*, JX346 (Vistar responding on July 19, 2013 to Buntin's request to explain the provision on a "Sale" in the Second Round Notes and writing that such provision meant "if we sell the company before you convert you will either get your money back or the note will convert. The note will convert only if that gives you the greatest out[c]ome"). Certain Plaintiffs also testified that their understanding was that the terms of the Second Round Notes were not negotiable or had already been negotiated (see discussion regarding "lead investor" below), and the decision presented to them was to invest or not invest based on the terms presented. *See* Tr. (Horwitz) 241:7–242:4; Tr. (Lipitz) 444:22–445:3; Tr. (Becker) 642:24–643:14; Tr. (Buntin) 699:16–700:9; Tr. (Ostheimer) 1162:10–1168:6.

[78] JX163 at 0001.

"[u]pon maturity … the principal and 4% accruing interest on the note automatically convert into Common Stock …. This is not market. We would not want Common Stock and we would not want automatic conversion if you fail to raise a Qualified Financing – instead, we would want to be repaid or extend the maturity at our discretion" (this is the first comment of Valhalla's list) and (b) "there should be optional conversion of Notes if you raise less than $2 million in equity financing" (this is the third comment of Valhalla's list).[79]

On December 24, 2012, Vistar replied to Valhalla stating, in part: "[p]lease find a red line including the changes requested in your email below."[80] The redline attached by Vistar included the following language on conversion at maturity:

> This Note shall have a maturity date of ~~January~~ September 3~~1~~0, 2014. If a Non-Qualified Financing has occurred but the Notes have not yet been converted, then at maturity the outstanding principal and interest under this Note will convert into the Non-Qualified Financing Securities as defined below. If a Non-Qualified Financing has not occurred, then at maturity the outstanding principal and interest under this Note will, at the discretion of the Holder, be repaid in full or ~~At the maturity date the Note will~~ convert into shares of common stock at a price per share equal to a pre-money valuation equal to $6.0 million. If the Holder elects to be repaid in full, the Holder must provide written notice to the Maker by July 1, 2014.[81]

---

[79] *Id.*

[80] JX184 at 0001. Vistar's response also indicated that it "had not yet added language around point 4 or 7" of Valhalla's previous email and that Valhalla and Vistar should discuss those points and whether to include them in a separate "side letter." *Id.* These "points" are not pertinent here.

[81] JX184 at 0013. Vistar's email did not include a "clean" copy and the "redline," as the name implies, used red font color to indicate changes, with deletions further shown with ~~strikethrough~~, and additions further shown using underlining. For the ease of the reader, the text is reproduced here only in black font color, with deletions shown using ~~strikethrough~~ and additions shown using underlining.

19

Vistar retained the language on automatic conversion in case of a "Qualified Financing" from the First Round Notes and Vistar added a provision that provided in the case of "Non-Qualified Financing" the holder would have the option to convert the principal and interest of its note into the same type of securities issued in such financing.[82]

Valhalla responded on December 27, 2012, that, in part, Valhalla had reviewed the document provided by Vistar and "cleaned up some of the language in the attached clean and redline copy."[83]  The redline version of the draft attached by Valhalla contained the following language:

> This Note shall have a maturity date of September 30, 2014. ~~If a Non-Qualified Financing has occurred but the Notes have not yet been converted, then at maturity~~ (the Maturity Date"). <u>Subject to the provisions related to the conversion of this Note</u>, the outstanding principal ~~and interest under~~<u>balance of</u> this Note ~~will convert into the Non-Qualified Financing Securities as defined below. If a Non-Qualified Financing has not occurred, then at maturity the outstanding principal and interest under this Note will, at the discretion of the Holder, be repaid in full or convert into shares of common stock at a price per share equal to a pre-money valuation equal to $6.0 million. If the Holder elects to be repaid in full, the Holder must provide written notice to the Maker by July 1, 2014.~~<u>, together with interest accrued and unpaid to date shall be payable the earlier of (x) the Maturity Date, (y) a Sale (as defined below or (z) an Event of Default (as defined below).</u>[84]

---

[82] *Id.* at 0013–14.

[83] JX185 at 0001.

[84] *Id.* at 0017.  Again, as the name implies, the redline attached to the email used several font colors to reflect additions and deletions, in this case a red or green font without <u>underlining</u> indicated deletion and green or blue font with <u>underlining</u> indicated additions.  For the ease of the reader, the text is reproduced here only in black font color, with deletions shown using ~~strikethrough~~ and additions shown using <u>underlining</u>.

There were additional line edits to the language of the conversion provisions for a "Qualified Financing" and a "Non-Qualified Financing", however, these edits did not change the automatic conversion and optional conversion, respectively, in the case of such events.[85]

Vistar replied to Valhalla on December 28, 2012, writing that it was "happy with the language in the latest draft."[86]

### E. Vistar Finalizes and Issues the Second Round Notes

Plaintiffs do not claim that Valhalla negotiated on the behalf of any of the other Plaintiffs in the second round convertible promissory notes.[87] Certain Plaintiffs testified at trial that in their experience investing in financing rounds of early-stage companies, one investor or multiple investors often act as a "lead investor" who negotiates terms of the financing with the company, and the resulting terms are then carried across for all investors.[88] In the course of negotiations, certain

---

[85] *Id.* at 0017–18.

[86] JX190 at 0001. Vistar did note a couple points, not related to conversion, that it "wanted to clarify that would be minor changes." *Id.*

[87] Additionally, Valhalla stated in its answers to Vistar's second set of interrogatories that it did not negotiate "expressly on behalf of any other Plaintiff or entity." JX990 at 0009–10.

[88] *See, e.g.*, Tr. (D'Andrea) 15:4–23; Tr. (Langsam) 289:4–14; Tr. (Becker) 641:9–642:20. The other investors would not necessarily know which investor(s), if any, is acting as the lead investor. *See* Tr. (Becker) 642:21–23 (testifying that he did not know who the lead investor was for the Second Round Notes); Tr. (Lipitz) 444:8–10 (also testifying he did not know who the lead investor was for the Second Round Notes); Tr. (Young) 499:8–17 (testifying that he just knew they, Eniac, were not the lead investor). *But see* Tr. (Boszhardt) 367:14–16 (testifying Great Oaks knew the lead investor for the Second Round Notes was Valhalla).

21

Plaintiffs asked Vistar for and received information on who else was participating in the second round of convertible promissory notes.[89]

After agreeing to Valhalla's edits on December 28, 2012, Vistar reached out to Eniac and Raptor Group, sharing revised versions of the convertible promissory notes that included the language on conversion as last drafted by Valhalla.[90] On January 7, 2013, Vistar sent out final versions of the convertible promissory notes, provided its wire instructions, and requested that a counter-signed agreement be returned; these convertible promissory notes included the following language (the "Second Round Note Conversion Terms") as had been provided by Valhalla to Vistar:

> This Note shall have a maturity date of September 30, 2014 (the Maturity Date"). Subject to the provisions related to the conversion of this Note, the outstanding principal balance of this Note., together with interest accrued and unpaid to date shall be payable the earlier of (x) the Maturity Date, (y) a Sale (as defined below) or (z) an Event of Default (as defined below).

---

[89] *See, e.g.*, JX235.

[90] Vistar emailed Eniac on December 29, 2012, attaching a redline document of the convertible promissory note and writing that it "had input from Raptor [Group] and Valhalla at this point so would expect only you guys to have any last comments." JX193. After a further follow up on January 2, 2013 to ask for sign off so that "[Vistar] can circulate to the rest of the round from Vistar," Eniac signaled to Vistar that it was signed off on the convertible promissory note. JX218. Vistar emailed Raptor Group on January 2, 2013, noting that Vistar "[is] waiting for final comments from Eniac." JX219. Vistar emailed Raptor Group on January 4, 2013 and attached a further draft of the convertible promissory note, writing "added the rep we discussed. Let me know if it works for you guys." JX222. Other than correction of minor typographical errors, the language of the notes was identical to that provided by Valhalla in its negotiations with Vistar. The parties have not argued there is any substantive difference in the language regarding conversion as drafted by Valhalla and the final version as executed.

Effective upon the closing of a Qualified Financing (as defined below), all of the outstanding principal and interest under this Note will automatically be converted into shares of the same class and series of capital stock of the Maker issued to other investors in the Qualified Financing ( the "Qualified Financing Securities") with the same rights and privileges at a price per share equal to 80% of the price per share paid by the lead investor in the Qualified Financing, or, if less, an amount determined assuming the pre-money valuation of the Maker in such Qualified Financing is equal to $6.0 million, with any resulting fraction of a share rounded to the nearest whole share (with 0.5 being rounded up).

Effective upon the closing of a Non-Qualified Financing (as defined below), the Holders shall have the option to convert the outstanding principal and interest under this Note into shares of the same class and series of capital stock of the Maker issued to other investors in the Non-Qualified Financing (the "Non-Qualified Financing Securities") with the same rights and privileges at a price per share equal to 80% of the price per share paid by the lead investor in the Non-Qualified Financing, or, if less, an amount determined assuming the pre-money valuation of the Maker in such Non-Qualified Financing is equal to $6.0 million, with any resulting fraction of a share rounded to the nearest whole share (with 0.5 being rounded up).[91]

Vistar issued the Second Round Notes on or about December 31, 2012, March 1, 2013, June 1, 2013, and September 1, 2013, which had an aggregate principal amount of $1.5 million.[92]  Each of the Second Round Notes were identical in all respects with the exception of the date, the identity of the holder, and the principal amount, and therefore included the Second Round Note Conversion Terms.[93]

---

[91] Note at 0001–02.

[92] PTO ¶ 54.  In 2014, Occam transferred and assigned $15,000 of its Note to nonparty Eoin Townsend. PTO ¶ 55.  Five nonparties to this litigation also participated in the Second Round Notes, each with issue dates of December 31, 2013. PTO ¶ 56.

[93] PTO ¶ 57.

The Second Round Notes also included terms that provided: (1) "[i]n the event of a "Sale" (as defined [therein]) of [Vistar] prior to the closing of a Qualified Financing, the [Second Round] Note will be payable for the greater of (a) the unpaid principal and interest or (b) the amount that would have been received had such note holder converted into common stock at a pre-money valuation equal to $6.0 million; (2) each Second Round Note "may not be prepaid, in whole or in part, without the prior written consent of the [h]older" and (3) "[a]t any time after the occurrence and during the continuance of an Event of Default [(as defined therein)], the Majority Holders (as defined [therein]) shall have the right to accelerate the [Second Round] Notes."[94] The Second Round Notes also included a provision that "[Vistar] hereby waives presentment, demand, protest and notices of every kind and assents to any permitted extension of the time of payment."[95]

The Second Round Notes had a stated maturity date of September 30, 2014 (the "Initial Maturity Date").[96] The Second Round Notes did not contain an express provision regarding extending the maturity date.[97] The Second Round Notes could be "modified or amended only by a written instrument duly executed by [Vistar] and by the holders of at least a majority of the aggregate amount of outstanding principal

---

[94] Note at 0002. An "Event of Default" was not defined in the Second Round Notes to include failure to repay by Vistar after the maturity date. *See id.*
[95] *Id.* at 0003.
[96] PTO ¶ 58.
[97] *See* Note.

under the [Second Round] Notes (which shall include Valhalla Partners II, L.P. so long as it is a holder of a [Second Round] Note)."[98]

*F. The First Round Notes Mature and the Maturity Date of the Second Round Notes is Extended Twice*

In accordance with the terms of the First Round Notes (and the First Round Note Conversion Language included therein), Great Oaks Venture Capital LLC's and Becker's First Round Notes automatically converted into common stock of Vistar upon maturity of the First Round Notes, on or about January 31, 2014.[99] Great Oaks Venture Capital LLC and Becker are Vistar stockholders and currently hold Vistar common stock.[100]

The Second Round Notes, on the other hand, were extended twice via written "Agreement among Vistar Media Inc. Noteholders": first from the Initial Maturity Date to September 30, 2015 (the "First Extended Maturity Date"), and second from the First Extended Maturity Date to March 31, 2016 (the "Second Extended Maturity Date").[101]

On the Initial Maturity Date, Valhalla wrote to Vistar that the Second Round Notes had expired and Vistar may want to extend the maturity date of the Second

---

[98] *Id.* at 0002.
[99] PTO ¶¶ 51, 52.
[100] *Id.* ¶ 53.
[101] *Id.* ¶ 59.

25

Round Notes.[102]  Vistar responded on the same day that its "lawyers are drafting an extension request."[103]  In an e-mail from Vistar to some holders of Second Round Notes sent on October 2, 2014, Vistar requested that the holders sign a note extension agreement and wrote that:

> [T]he maturity of the note was September 2014. As a result of our growing revenue which has exceeded our projections, we burned very little cash and have not needed to raise a qualifying financing. As such we need to extend the maturity of the note by 12 months to September 2015.[104]

After receiving Vistar's email, at least DFJ Mercury emailed Vistar and asked why Vistar did not convert the Second Round Notes; Vistar responded that conversion only occurred on a Qualified Financing.[105]

In an e-mail from Vistar to some holders of Second Round Notes sent on June 28, 2015, Vistar requested that the holders sign another extension request and wrote that "[w]e are doing extremely well and are massively ahead of budget.  As a result of our success, we do not see the need for another funding round before September of this year when the convertible note is set to mature. In light of that, we would like to request an extension until March of 2016."[106]

---

[102] JX488.
[103] *Id.*
[104] JX501.
[105] JX500.
[106] JX617.

26

After the two written extensions, the Second Round Notes reached maturity on March 31, 2016 and were not extended again by written extension.[107]  Leading up to the Second Extended Maturity Date, at least Great Oaks reached out to Vistar to inquire about the status of the Second Round Notes, including on March 26, 2016.[108]  In response, Vistar wrote that Great Oaks' Second Round Note "is still outstanding and has not been converted. We will need to ask for approval from note holders again for extension."[109]  Great Oaks then asked Vistar why the Second Round Notes were not going to be converted to preferred equity "if business is so robust?"; Vistar responded that the Second Round Notes did not contain such language and required a "qualified financing to convert into preferred stock."[110]  Great Oaks accepted this explanation, noting it was "an exceptional period of time to have seed stage notes outstanding, and highly unusual for startups that have grown fast and disciplined financially," but also expressed that "[it would] like to know what other investors are thinking" and that "there has been a dearth of communication over [the] last few years."[111]  Vistar wrote back on March 27, 2016 that "[it] will canvas for other people's preferred action plan and also discuss with [its] lawyers."[112]

---

[107] PTO ¶ 60.
[108] JX794 at 0004.
[109] *Id.* at 0003–04.
[110] *Id.* at 0003.
[111] *Id.*
[112] *Id.*

Following the Second Extended Maturity Date, on May 10, 2016, Great Oaks asked Vistar when Vistar expected to do a qualified financing that would convert the Second Round Notes; Vistar responded that it expected one "over the next 6 months."[113] Great Oaks continued to check in with Vistar on July 13, 2016, October 1, 2016 and December 1, 2016.[114] In response to the October check-in, Vistar wrote "[n]o need for fresh capital at the moment but going to speak with our lawyers about note cleanup ideas in Q4."[115]

### G. Vistar Interactions with Holders of Second Round Notes Prior to Maturity

In addition to the communications around the two extensions of the maturity date of the Second Round Notes, Vistar had multiple communications with holders of Second Round Notes prior to maturity.[116] These included communications

---

[113] *Id.* at 0002.

[114] *Id.* at 0001–02

[115] *Id.* at 0001.

[116] Vistar also made statements to third-parties that suggested the Second Round Notes would convert or were intended to convert to equity. *See* JX314 (Vistar noting to a third party on April 6, 2013 that the Second Round Notes were "convertible note[s]" and Vistar "[does not] have stock certificates," but "[when] the [Second Round Notes] convert into shares we will distribute then."); JX575 (Vistar noting to a third party on February 25, 2015 that a Second Round Note is "basically an equity instrument"); JX577 (Vistar noting to a third party on March 2, 2015, that the Second Round Notes "[are] intended to convert to shares as well" and that "the interest [] accrues to the principal and then the total face value is used for converting the note into shares."); JX585 (Vistar noting to a third-party on May 4, 2015 that "[the Second Round Notes] will almost 100% convert into common. When that will happen I couldn't tell you 100%. Over next 18 months I really think so.").

28

initiated by Vistar, such as updates on Vistar's performance[117] and requests for introductions to persons and entities that could be helpful to Vistar's business.[118] Holders of Second Round Notes also initiated communications with Vistar, including to request updates on Vistar's performance (including whether Vistar was considering financing),[119] to offer introductions to persons and entities that could be helpful to Vistar's business,[120] and to request information on the Second Round Notes for accounting and financial reasons.[121]

In addition to the above communication with Great Oaks that followed the Second Extended Maturity Date, Vistar and Valhalla discussed various valuations for Vistar on June 8 and 9, 2016.[122] In response to a question regarding personal financial planning, Vistar told Becker on October 13, 2016 that the Second Round

---

[117] *See, e.g.*, JX441 (Vistar providing a "Q1 2014 Update," summarizing, among other things, Vistar's financial performance and key initiatives).

[118] *See, e.g.*, JX394 (Vistar asking a representative of a Plaintiff for an introduction).

[119] *See, e.g.*, JX535 (Valhalla checking in with Vistar).

[120] *See, e.g.*, JX518 (Vistar and Eniac discussing potential strategic introductions Eniac can make).

[121] For example, Vistar provided capitalization tables of Vistar to certain holders of Second Round Notes for accounting purposes that showed holders of the Second Round Notes, on a fully diluted basis that assumed conversion of the Second Round notes to equity, as holding Vistar equity. *See, e.g.*, JX667 (Vistar providing Advancit with financial statements on December 4, 2015). Vistar for accounting purposes recorded the Second Round Notes as "Purchase of Stock" on its financial statements. *See, e.g.*, JX410 (Vistar sharing financial statements with DFJ Mercury on January 20, 2014); JX672 (Vistar sharing financial statements with Eniac on February 11, 2016). Prior to Advancit's purchase of a Second Round Note, Vistar also shared financial statements with Advancit on January 29, 2013 that showed the Second Round Notes issued up to that point as "Purchase of Stock." *See* JX268.

[122] *See* JX690.

29

Notes were "still outstanding" and it is "hard to say what [the] estimated current value is."[123]

### H. Vistar Considers Further Transactions and Repaying the Second Round Notes

Around late 2016, Vistar had internal discussions related to repaying the Second Round Notes.[124] In a unanimous written consent, dated February 17, 2017, Vistar's Board of Directors, which consisted of Provenzano, Ozen, and Chadwick, adopted and approved resolutions to, among other things: (1) approve debt financing from Capital Southwest Corporation ("CSC"), (2) repay the Second Round Notes and (3) to use the proceeds of the CSC debt financing to repurchase Vistar common stock.[125]

Vistar secured $20,000,000 in debt financing from Capital Southwest Corporation ("CSC") in or about February 2017.[126] On February 23, 2017, Vistar reached out to equity holders to announce the tender offer approved by Vistar's Board of Directors, which had an expiration date of March 31, 2017.[127]

---

[123] *See* JX714.
[124] Tr. (Provenzano) 988:2–9.
[125] *See* JX749 at 0002–07.
[126] PTO ¶ 66.
[127] *See* JX750; JX752. Becker and Great Oaks, as Vistar shareholders, were provided with audited financial statements of Vistar on February 23, 2017, which Plaintiffs contend did not show the Second Round Notes as a current liability that was expected to be repaid within 12 months, or as a liability at all. *See* JX750; JX752. In addition, Vistar again referred to Becker's Second Round Note as "still outstanding" in communication between Vistar and Becker regarding the tender offer. JX753.

*I. Vistar Purports to Repay the Second Round Notes*

On March 16, 2017, Vistar notified the holders of Second Round Notes by email, including each Plaintiff, of Vistar's intent to repay their Notes in full on March 31, 2017.[128] Vistar's email included a payoff letter and noted that if the payoff letter was not returned, a physical check would be sent on March 31, 2017 to the holder.[129]

Certain Plaintiffs responded to Vistar by email on March 16 and March 17, 2017.[130] Their immediate reactions varied, but were consistent in voicing an expectation that the Second Round Notes would convert to equity.[131] Between March 21, 2017 and March 24, 2017, Plaintiffs Valhalla, Great Oaks, Becker, Advancit, Eniac I, Eniac II, Pallotta, DFJ Mercury II, DFJ Mercury Aff., Draper, and Buntin responded to Ozen's March 16, 2017 communication, contesting Vistar's right to repay the Notes.[132] On or about March 30, 2017, Vistar proceeded to send Plaintiffs individual checks in the amounts of principal plus interest previously

---

[128] PTO ¶ 61. No evidence was presented that Vistar had previously discussed repayment of the Second Round Notes with any Plaintiff, and Advancit recalled a telephone conversation between Advancit and Vistar on March 14, 2017 where Vistar had "made the joke, [Vistar] better be [Advancit's] fund-returner," which Advancit took to mean that "the return on [its] investment would return the whole size of [Advancit's] fund." Tr. (Ostheimer) 1195:13–1196:10.

[129] *See, e.g.*, JX774.

[130] *See* JX759; JX763; JX778; JX772; JX794.

[131] Becker expressed disbelief that the Vistar was repaying the Second Round Note and asked what the repayment meant for the equity conversion. *See* JX759. Eniac expressed surprise and asked for its Second Round Note to be converted. *See* JX763. Horowitz's reaction was similarly to ask for conversion. *See* JX778. Su and Ocean Assets asked for an explanation, both expressed their expectation that the Second Round Note would eventually convert to equity. *See* JX772; JX794.

[132] PTO ¶ 62.

identified by Vistar.[133]  Between March 31, 2017 through April 6, 2017, Plaintiffs rejected the attempted repayment of the Notes and returned their checks, uncashed, to Vistar.[134]  Prior to Vistar's attempt to repay the Second Round Notes, there was no "Sale," "Event of Default," "Qualified Financing," or "Non-Qualified Financing" (as those terms are defined in the Second Round Notes).[135]

### J.  Vistar's Multiple Litigations and Issuance of Preferred Securities

During the negotiation process for the Second Round Notes (and the First Round Notes) and in connection with questions regarding the Second Round Notes after the notes were issued, including with regard to the purported repayment of the Second Round Notes, Plaintiffs largely corresponded with Ozen as the representative for Vistar.[136]  Provenzano took over these duties following Ozen's departure from Vistar in 2017, notifying certain holders of Second Round Notes in October 21, 2017 e-mails that Ozen was no longer with Vistar.[137]  Ozen brought litigation against Vistar on October 30, 2017, and the parties settled in October 2018, evidenced by a settlement agreement dated April 3, 2019, which included Vistar repurchasing all of Ozen's equity in Vistar.[138]

---

[133] *Id.* ¶ 63.
[134] *Id.* ¶ 64.
[135] *Id.* ¶ 65.
[136] Tr. (Provenzano) 1050:5–22.
[137] *E.g.*, JX852.
[138] *See* JX870.

Vistar had engaged a financial advisor on May 31, 2017,[139] which led to multiple discussions with interested investors regarding equity sales.[140] Among others, Vistar had discussions with Edison Partners IX, LP ("Edison"), which following due diligence, sent Vistar a letter of intent regarding equity financing on February 21, 2019[141] and a term sheet on March 6, 2019.[142] On March 13, 2019, Plaintiffs filed their initial Complaint and began this litigation.[143] Edison and Vistar had traded drafts of the term sheet, but on March 18, 2019, Provenzano reported to Vistar's financial advisor that "[Edison] pulled out[] [citing] the [noteholders'] lawsuit" and Edison's concern that if Plaintiffs were able to convert their Second Round Notes, they would hold the same preferred equity as Edison would buy, which Edison did not want.[144] Vistar had separately been negotiating debt financing from Silicon Valley Bank ("SVB").[145] A February 20, 2019 debt financing proposal from SVB was contingent on Vistar receiving a certain amount of equity financing,[146] which Vistar did not believe it could achieve after Edison abandoned the transaction.[147] Vistar then arranged a loan with CWC, which Provenzano

---

[139] JX837.
[140] Tr. (Provenzano) 1013:16–1016:18.
[141] *See* JX880.
[142] JX886.
[143] Verified Compl., Dkt. No. 1.
[144] JX902. Edison provided internal notes that included, with respect to Vistar, "Pencils down due to legal complaint against company from prior, earlier investors." JX934 at 0002.
[145] *See* JX878.
[146] *Id.* at 0005.
[147] Tr. (Provenzano) 1026:5–23.

testified Vistar needed to satisfy its obligation under the settlement it entered into with Ozen.[148]

In July 2021, Vistar issued a new series of preferred securities to Lamar Investments, LLC ("Lamar") in a transaction generating gross cash proceeds to Vistar in excess of $2,000,000.[149]

### K. Procedural History

Valhalla, Pallotta, Great Oaks, Becker, Advancit, Eniac II, Eniac I, DFJ Mercury II, DFJ Mercury Aff., Occam, Su, Buntin, and Ocean Assets filed a Complaint on March 13, 2019.[150] Vistar filed its Answer and Counterclaim on April 24, 2019.[151] Plaintiffs filed their Answer to Vistar's Counterclaim on May 28, 2019.[152] On June 4, 2019, Vistar filed a Motion for Judgment on the Pleadings as to the Complaint and the first count of its Counterclaim.[153] I heard oral arguments on the Motion for Judgment on the Pleadings on November 4, 2019; from the bench, I denied the Motion.[154]

---

[148] Tr. (Provenzano) 1022:23–1023:16.
[149] PTO ¶ 67.
[150] Verified Compl., Dkt. No. 1.
[151] Answer and Verified Countercl., Dkt. No.4.
[152] Answer to Countercls., Dkt. No. 5.
[153] Def./Countercl. Pl. Vistar Media, Inc.'s Mot. for J. on the Pleadings as to Counts I-IV of the Verified Compl. and Count I of the Verified Countercl., Dkt. No. 6.
[154] Tr. of 11.4.19 Oral Arg. and Ruling of the Court on Def./Countercl. Pl.'s Mot. for J. on the Pleadings, Dkt. No. 30.

As stipulated and agreed by the parties on March 18, 2020,[155] Plaintiffs filed an Amended Complaint on March 24, 2020 adding Draper and Horwitz as additional plaintiffs.[156] Vistar subsequently filed its Answer and Counterclaim on April 22, 2022 and Plaintiffs filed an Answer to the Counterclaim on May 6, 2020.[157] On July 14, 2022, by letter decision, I granted Plaintiff's Renewed Motion for Leave to File a Second Amended Complaint,[158] which was filed on May 10, 2022.[159]

On July 19, 2022, Plaintiffs filed their Second Amended Complaint, which included a new claim and added certain allegations.[160] Vistar filed its Answer and reasserted its Counterclaim on August 11, 2022,[161] which were amended on September 15, 2022.[162] Plaintiffs filed an Answer to such amended Counterclaim

---

[155] Granted (Stipulation and [Proposed] Order Governing Am. Compl.), Dkt. No. 42.

[156] Verified Am. Compl., Dkt. No. 45. Nat Turner Investments LLC ("Nat Turner") was also added as an additional plaintiff. However, on February 28, 2022, I granted Vistar and Plaintiff Nat Turner's Stipulation and [Proposed] Order of Dismissal with Prejudice, thereby dismissing Plaintiff Nat Turner from this action. Granted (Stipulation and [Proposed] Order of Dismissal with Prejudice as to Pl. and Countercl. Def. Nat Turner Invs. LLC and Def. and Countercl. Pl. Vistar Media, Inc.), Dkt. No. 189.

[157] Vistar Media's Answer to First Am. Compl. and Verified Countercl., Dkt No. 50; Answer to Verified Countercls., Dkt. No. 52.

[158] *Valhalla Partners II, LP. v. Vistar Media, Inc.*, 2022 WL 2733963 (Del. Ch. July 14, 2022).

[159] Pls.' Renewed Mot. for Leave to File Second Am. Compl., Dkt. No. 190. This followed a Motion for Leave to File a Second Amended Complaint filed by Plaintiffs on December 17, 2020, which I denied on February 24, 2021. Pls.' Mot. for Leave to File a Second Am. Compl., Dkt. No. 103; Tr. of 2.24.21 Oral Arg. Re and Pls.' Mot. to Amend and the Court's Ruling, Pls.' Mot. to Compel Prod. of Documents, and Pls.' Mot. to Compel Documents Withheld as Privileged held via Zoom, Dkt. No. 124.

[160] Verified Second Am. Compl., Dkt. No. 199. It also reflected the removal of Nat Turner as a Plaintiff.

[161] Vistar Media's Answer to Second Am. Compl. and Verified Countercl., Dkt. No. 200.

[162] Verified Am. Countercl., Dkt. No. 208. The amendment reflected Nat Turner's removal from the case.

on October 5, 2022.[163]  On December 7, 2022, (a) Vistar moved for summary judgment on all counts of Plaintiffs' Second Amended Complaint and on Count I of its Counterclaim and (b) Plaintiffs moved for summary judgment on Count II of Vistar's Counterclaim.[164]  I heard oral arguments on the Parties' Motions for Summary Judgment on September 19, 2023; from the bench, I denied both Motions.[165]  The parties pursued trial, which took place over four days on March 4, 5, 6 and 7, 2024.  I heard post-trial oral argument on June 25, 2024.[166]

Plaintiffs submitted cross Motions in Limine regarding expert testimony.[167]  I have not relied on such testimony in reaching my conclusions in this matter.

## II. ANALYSIS

Plaintiffs seek declaratory judgment and, in the alternative, bring claims for breach of the implied covenant of good faith and fair dealing, promissory estoppel, equitable estoppel and reformation, in all cases that their Second Round Notes could not be unilaterally repaid by Vistar in 2017 and therefore persisted until 2021 when Vistar issued preferred securities to Lamar.  Defendant Vistar in its Counterclaim seeks declaratory judgment that the Second Round Notes were "negotiable

---

[163] Answer to Verified Am. Countercl., Dkt. No. 210.

[164] Pls.' Mot. for Partial Summ. J., Dkt. No. 216; Def./Countercl. Pl. Vistar Media, Inc.'s Mot. for Summ. J., Dkt. No. 217.

[165] *See* Tr. of 9.19.23 Oral Arg. on Mot. for Summ. J. 65:6–68:9, Dkt. No. 245.

[166] Tr. of 6.25.24 Post-Trial Oral Arg., Dkt. No. 300.

[167] Mot. in Lim. to Exclude the Proposed Expert Report, Ops., and Test. of Dr. John Finnerty, Dkt. No. 248; Mot. in Lim. to Exclude the Proposed Expert Report, Ops., and Test. of Dr. Ilya Strebulaev, Dkt. No. 249.

instruments" as defined in Article 3 of the Delaware Uniform Commercial Code ("UCC"), and brings a claim for breach of contract alleging that Plaintiffs' rejection of repayment in 2017 was a breach of the Second Round Notes, which Vistar avers prevented it from completing equity and debt financing with Edison and SVB, respectively, in 2019.

## A. *Interpreting the Ambiguous Language of the Second Round Notes*

### 1. The Second Round Note's Language is Ambiguous

The key point of contention in this action arises from the following language from the Second Round Notes: "Subject to the provisions related to the conversion of this [Second Round] Note, the outstanding principal balance of this [Second Round] Note[], together with interest accrued and unpaid to date shall be payable the earlier of (x) the Maturity Date, (y) a Sale (as defined [therein]) or (z) an Event of Default (as defined [therein])."[168] Vistar argues that the preceding language gave Vistar the right to repay the holders of Second Round Notes, as it sought to do in 2017, once the maturity date passed.[169] In contrast, Plaintiffs argue that no such right existed and following the maturity date it was only at each holder's discretion to demand repayment from Vistar.[170]

---

[168] Note at 0001.
[169] Def./Countercl. Pl. Vistar Media, Inc.'s Post-Trial Opening Br. 21, Dkt. No. 291 ("Def.'s Opening Br.").
[170] Pls.' Opening Br. 29–30.

I rejected the parties' Cross Motions for Summary Judgment on the grounds that the language is ambiguous in the context of repayment following the Maturity Date.[171] I found Vistar's construction of the contract to be the natural reading of the contractual language, on its face, but also found that Plaintiffs' construction was not inconsistent with the language at issue, and found that extrinsic evidence might support their reading of the contract. That finding is law of the case.[172] Thus, I turn to the extrinsic evidence.

## 2. Legal Framework

Delaware courts may consider extrinsic evidence to resolve contractual ambiguity.

> If the contract is ambiguous, a court will apply the parol evidence rule and consider all admissible evidence relating to the objective circumstances surrounding the creation of the contract. Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry. After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation.[173]

---

[171] *See* Tr. of 9.19.23 Oral Args. on Mot. for Summ. J. 65:6–68:9, Dkt. No. 245.

[172] "The law of the case doctrine is a self-imposed restriction that prohibits courts from revisiting issues previously decided, with the intent to promote 'efficiency, finality, stability and respect for the judicial system.'" *See State v. Wright*, 131 A.3d 310, 321 (Del. 2016) (quoting *Cede&Co. v. Technicolor*, 884 A.2d 26, 39 (Del. 2005)).

[173] *Salamone v. Gorman*, 106 A.3d 354, 374–75 (Del. 2014) (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) (alterations in original)).

38

The text, of course, remains paramount, and "the introduction of extrinsic, parol evidence does not alter or deviate from Delaware's adherence to the objective theory of contracts."[174] The Court should, "where possible, avoid an interpretation that would render any provision illusory or meaningless."[175]

### 3. Vistar Sought Out Venture Capital and Angel Investor Funding

Plaintiffs have introduced into the record a multitude of convertible promissory notes that they have participated in with third parties, to support the contention that issuer discretionary repayment at maturity is not part of the business custom and usage of convertible promissory notes in the venture capital industry. Vistar, among other responses to the voluminous production, has alluded to the relative inexperience of Vistar's executive team in such matters at the time of negotiation of the Second Round Notes. It is fair to question what knowledge should be ascribed to Vistar, a fledgling advertising software company, of the business custom and usage of the specific terms of convertible promissory notes in the venture capital industry. However, even assuming Vistar's familiarity with the business custom and usage of convertible promissory notes in the industry, I do not find such business custom and usage of convertible promissory notes helpful to resolve the

---

[174] *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *18 (Del. Ch. Mar. 30, 2017) (quoting *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007)).
[175] *Id.* at *19 (quoting *Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *6 (Del. Ch. Oct. 23, 2002)).

ambiguity in the specific language here. Convertible promissory notes, as demonstrated by the extrinsic evidence, are not uniform and are subject to negotiation. Plaintiffs' conclusion, based on the extrinsic evidence, is that such notes are always drafted in such a way as to be favorable to the holders, and therefore, any ambiguity must be resolved in favor of Plaintiffs. But that theory does not comport with the existence of the many bespoke notes that were put in evidence, and is inconsistent with the drafting history here, as addressed below.

Vistar did negotiate with Valhalla and engaged Plaintiffs on the Second Round Notes knowing that they, by and large, were venture capitalists and angel investors who made risky investments in early-stage companies with the general goal of holding equity in successful companies. While the documented interactions between Plaintiffs and Vistar as it sought access to Plaintiffs lends credence to Vistar's knowledge of this general goal of Plaintiffs, I fail to find further relevance from the business custom and usage of convertible promissory notes in the venture capital industry to resolve the particular ambiguity at issue.

4. The Negotiation History Between Valhalla and Vistar

The First Round Note Conversion Terms provided for either automatic conversion to common stock at maturity or automatic conversion upon qualified financing into the same type of issued securities. Under these terms, the First Round

40

Notes ended at maturity, but absent a bankruptcy or similar event prior to maturity, holders of First Round Notes would in all cases receive equity in Vistar.

The First Round Note Conversion Terms were used as Vistar's starting point for the Second Round Notes. Vistar proposed those terms to Valhalla, which rejected certain provisions. Valhalla requested different conversion terms by e-mail (Valhalla's "first counter-offer"), seeking specifically that: at maturity a Second Round Note holder have the sole discretion to extend the maturity or demand repayment in cash; in the case of a Qualified Financing there would be automatic conversion; and in the case of a Non-Qualified Financing the holder would have the option to convert. Under Valhalla's terms, a holder may never receive equity if a conversion event never occurred, but the holder could continue to extend the maturity of the Second Round Notes in the hopes one would occur, and repayment in cash would only be at the discretion of the holder. This is essentially the contract that Plaintiffs seek to enforce here.

Vistar responded, in general, positively to Valhalla' first counter-offer, but countered with a draft convertible note (Vistar's "counter-offer draft") that differed in significant ways from Valhalla's first counter-offer. Vistar's counter-offer draft provided that: in the case of a Qualified Financing, there would be automatic conversion; in the case of Non-Qualified Financing, the holder would have the option to convert; if a Non-Qualified Financing occurred but the notes did not

41

convert, then at the maturity there would be an automatic conversion into the same securities as issued in the Non-Qualified Financing; and if no Qualified Financing had occurred by maturity (as was the case here), then the holder had the option to convert to common stock or be repaid in cash. Under Vistar's counter-offer draft, significantly, maturity *could not* be extended unilaterally by the holder; if at maturity the note had not converted to equity, the holder had to make a choice to either take common stock or cash. Notably, this was similar to the automatic conversion term in Vistar's initial offer for the Second Round Notes, providing for conversion to common at maturity, which Valhalla had already rejected.[176] Vistar's counter-offer draft was accompanied by an e-mail that stated the draft "[i]ncluded the changes requested in [Valhalla's] email"[177] that contained Valhalla's first counter-offer. Plaintiffs argue this statement was an unequivocal and express agreement to the terms Valhalla requested.[178] However, the statement is contravened by the explicit language of Vistar's counter-offer draft as summarized above, which is clearly inconsistent with Valhalla's first counter-offer.

---

[176] Vistar's counter-offer draft provided the option to take cash rather than common stock at maturity, an option the first-round notes lacked.

[177] JX184 at 0001.

[178] Pls.' Br. Opp'n to Vistar's Post-Trial Br. 23–24, Dkt. No. 296 ("Pls.' Answering Br.").

Valhalla responded to Vistar's counter-offer draft generally positively,[179] but said Vistar's draft needed "cleaning up."[180]  Accordingly, Valhalla attached its own draft of the Second Round Note (Valhalla's "final draft") with terms that differed from Vistar's counter-offer draft, in ways significant here.  In Valhalla's final draft, Valhalla substantively changed the provision at issue here, notably (1) removing the right to select common stock rather than payment at maturity and (2) omitting the unilateral extension right it had sought in its first counter-offer.  Vistar then accepted Valhalla's final draft and applied its terms to all Second Round Notes.

Vistar argues that there was a "unilateral deletion [by Valhalla] of language giving the Noteholders discretion with respect to repayment" in Valhalla's final draft, which "ipso facto means that they retain no discretion" and "are foreclosed from seeking to enforce a right they bargained away."[181]  Vistar's view of the negotiation history is therefore that, rather than receive either (1) what Valhalla initially asked for, extension or repayment at maturity, at its unilateral option, or (2) what Vistar proposed in return, including an option to convert to common or receive cash at maturity, Valhalla instead "bargained" to receive at maturity a third option:

---

[179] Importantly, Plaintiffs do not seek a declaratory judgement that they accepted the terms of the counter-offer draft, giving them an option for common stock or repayment at maturity.  Instead, they seek another term altogether; a right to unilaterally extend the maturity date, consistent with Valhalla's initial counter.

[180] JX185 at 0001 (Valhalla noting that it "cleaned up some of the language in the attached").

[181] Def./Countercl.-Pl. Vistar Media Inc.'s Post-Trial Answering Br. 12, Dkt. No. 295 ("Def.'s Answering Br.").

43

no optional extension right *and* no conversion to equity (optional or automatic), only the right to be repaid in cash. In other words, Valhalla countered with a third option that appeared to be worse for Valhalla than what Vistar had offered. As a negotiation tactic, this is implausible. However, Plaintiffs' view of the negotiation history is equally implausible. According to Plaintiffs, Vistar actually accepted Valhalla's initial request to receive a unilateral extension right at maturity, but Vistar mistakenly omitted that right in Vistar's counter-offer draft. Thus, Valhalla "cleaned up" Vistar's draft, but in some way again mistakenly omitted in its entirety the unilateral extension option. Plaintiffs' request, that I read this unilateral right *into its own draft* which was accepted by the parties as the binding agreement, finds no support in the drafting history.

Finally, Plaintiffs (other than Valhalla) did not question the express language of the contract, and, in some cases, could not recall whether they had read it.[182] Plaintiffs' principals uniformly testified that if they had thought an option existed where Vistar would succeed but nonetheless Plaintiffs would receive no equity, they would not have entered the Second Round Notes. Perhaps, but that is not, in my view, a ground to rewrite the contract.

---

[182] *See, e.g.*, Tr. (Becker) 637:8–23 (could not recall whether he read it and his practice at the time was to "check eye-level terms from time to time"); Tr. (Zawadzki) 1124:16–1127:12 (could not recall whether he or someone else read the note, although they asked for the subject entity to be changed, and noted that he assumed and expected the note worked in certain ways based on the industry).

44

5. The Ambiguous Language in the Second Round Notes Is Most

Reasonable Interpreted as a Right to Repayment at Maturity

As described above, I have not found business custom and usage of convertible promissory notes in the venture capital industry or the negotiating history between Vistar and Valhalla to be enlightening. I am left where the disagreement begins, the words of the contract. The parties bargained for a suite of rights. Vistar got an infusion of cash. In return, if Vistar entered Qualified Financing before maturity, Plaintiffs were entitled to an automatic conversion to equity of the same type issued in the Qualified Financing. In case of Non-Qualified Financing, Plaintiffs had the option to convert to equity of the same type issued in the Non-Qualified Financing or continue to hold their Second Round Notes. In case no Qualified Financing had come to pass by maturity, Plaintiffs had a right to repayment with interest. The most reasonable way to interpret "shall be payable" is that Plaintiffs had the right to be repaid (with interest) at maturity of the Second Round Notes. To read in a unilateral right of Plaintiffs to extend at maturity, based on the language present in the Second Round Notes, is supported neither by the express language of the contract nor the extrinsic evidence.

Plaintiffs argue that their reading should prevail because it fits within the overall scheme of the Second Round Notes, which they say "uniformly prioritized"

holders of the Second Round Note.[183]  But that reasoning is merely circular,[184] and

is not supported by the drafting history.  Next, Plaintiffs argue that, absent a

unilateral right to extend, Vistar would have "complete control over the outcome of

the [Second Round Notes]," creating a perverse incentive and contradicting the

overall scheme of the notes.[185]  In other words, Vistar would have to ability to do

what it is accused of doing here—eschew equity financing long enough to deny the

holders of the Second Round Notes the ability to receive equity.  But the ability to

avoid equity financing would require an unusually successful start-up, and it is not

clear to me that any of the parties were concerned with this rare scenario.  The parties

negotiated and bargained for a suite of rights (or in some cases, Plaintiffs accepted

the suite of rights presented to them), that included conversion to Vistar equity in

certain cases prior to maturity.  That these rights were beneficial to Plaintiffs or

demonstrative of the general intent of their investment does not mean that the only

reasonable interpretation of language in the Second Round Notes is to prioritize the

rights of Plaintiffs in all cases.  It is not unreasonable for the right to conversion to

have had a cutoff date.  Valhalla rejected Vistar's initial proposal that at such cutoff

date there would be an automatic conversion (into common stock) and rejected its

---

[183] Pls.' Opening Br. 39.
[184] That is, there is no "uniformity" unless Plaintiffs' interpretation is selected, based on the supposed quality of "uniformity."
[185] Pls.' Opening Br. 39.

next proposal that there would be an option to convert to common or be repaid. Having rejected those outcomes, Plaintiffs ask that I read in what would be the best outcome for them, but that unilateral right to extend was rejected by Vistar.

Plaintiffs also raise the Forthright Negotiator Principle, that is "in cases where the extrinsic evidence does not lead to a single, commonly held understanding of a contract's meaning, a court may consider the subjective understanding of one party that has been objectively manifested and is known or should be known by the other party."[186] I agree with Vistar that this is not an appropriate scenario to apply the Forthright Negotiator Principle. At most, Valhalla requested a unilateral right to extend at maturity; Vistar countered with an option to receive equity or cash at maturity, not an option to extend; and Valhalla responded with the language at issue, which also did not provide for a unilateral right to extend.

Each side has also raised the principle of *contra proferentum* and argued that the ambiguity should be construed against the other as the drafter.[187] Because I have interpreted the disputed language above, I need not employ the doctrine; "the rule of *contra proferentum* is one of last resort, such that a court will not apply it if a problem in construction can be resolved by applying more favored rules of

---

[186] *United Rentals*, 937 A.2d at 836; *see also Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003).
[187] Pls.' Opening Br. 37 n.131; Def.'s Opening Br. 31.

construction."[188] If I needed to address the doctrine, however, it is clear that the ambiguity arises from language provided solely by Valhalla.

Plaintiffs urge me to construe the contract in accordance with concepts of equity, if contract does not support them. It is clear that the result I have reached here is inconsistent with the general business model of Plaintiffs. The result that Plaintiffs seek here—imposition of a unilateral extension term that Vistar never agreed to—does not comport with the law of contracts, however.

Plaintiffs bring several additional theories for relief in the event declaratory judgment results in a reading of the Second Round Notes that does not provide Plaintiffs with the ability to extend maturity. Having resolved the ambiguity as a right to repayment with interest at maturity (without a right to unilaterally extend that maturity), I turn to two of Plaintiffs' other theories and find neither persuasive.

### B. Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs claim that Vistar breached the implied covenant of good faith and fair dealing. "The implied covenant is inherent in all contracts and ensures that parties do not frustrat[e] the fruits of the bargain by acting arbitrarily or unreasonably."[189] It is utilized "to infer contract terms 'to handle developments or

---

[188] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del. 1985) (citations omitted).

[189] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022) (internal quotations omitted).

contractual gaps that the asserting party pleads neither party anticipated.'"[190] The implied covenant is not a vehicle for imposing equity on a contract: "[it] is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[191]

Here, Valhalla and Vistar expressly discussed and negotiated what rights would inure to each at maturity of the Second Round Notes, and there is no gap in the Second Round Notes. The Second Round Notes in fact contain a provision on the very subject, that I have construed as providing for a right to repayment at maturity. I also understand Plaintiffs to raise Vistar's conduct after signing as offensive to the implied covenant, in that Plaintiffs allege that Vistar purposefully put off equity financing before maturity to frustrate the purpose of the Second Round Notes. I do not find this allegation to be substantiated by the record, which in contrast shows Vistar pursued equity financing and also twice extended the maturity date of the Second Round Notes. Further, implicit in Valhalla's argument is that a new obligation should be read into the agreements, that Vistar was required to make efforts to consummate an equity financing. I decline to add such an obligation under

---

[190] *Id.* (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotations omitted)).

[191] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

the rubric of the implied covenant. The success of Vistar, allowing it to grow without a sale of equity, was unusual, but not unforeseeable.

## C. Reformation

Plaintiffs also seek reformation of the Second Round Notes based on mistake. To justify reformation, Plaintiffs must:

> prove three elements by clear and convincing evidence: (1) that the party was mistaken about the contents of the final, written agreement; (2) that either its counterparty was similarly mistaken or that the counterparty knew of the mistake but remained silent so as to take advantage of the error; and (3) that there was a specific meeting of the minds regarding a term that was not accurately reflected in the final written agreement.[192]

The facts here cannot support reformation. Vistar first proposed automatic conversion to common stock at maturity. Valhalla rejected that, and countered that it wanted an option to take cash or extend the maturity date, unilaterally and indefinitely. Vistar countered with language that provided the option to take cash or convert to common at maturity,[193] but not with the open-ended extension right that Valhalla had sought. Valhalla then purported to "clean up" the language, removing thereby the option to take common stock rather than repayment at maturity. If this "clean up" was the error, it is not the reformation of this error that Plaintiffs seek. In

---

[192] *In re 11 W. P'rs, LLC*, 2019 WL 1300859, at \*5 (Del. Ch. Mar. 20, 2019) (citing *Glidepath Ltd. v. Beumer Corp.*, 2018 WL 2670724, at \*10 (Del. Ch. June 4, 2018)).
[193] Or, if a Non-Qualified Financing had occurred prior to maturity and the noteholder had not exercised its option to convert at the time, to be automatically converted into the securities issued in such Non-Qualified Financing.

order to find reformation consistent with Plaintiffs' position applicable, I would have to find that the parties agreed to Valhalla' *first proposal*, containing a unilateral right to extend at maturity, and that each side sought to capture this concept, but utterly failed. It is sufficient to say here that such a concept was not proven by clear and convincing evidence.

### D. Vistar's Counterclaims

I turn finally to Vistar's counterclaims. As an initial matter, Vistar's first counterclaim is for declaratory judgment that the Second Round Notes are "negotiable instruments" under Article 3 of the UCC.[194] Vistar did not argue this counterclaim at trial or mention it in its post-trial briefing.[195] To the extent this counterclaim has not already been conceded, the counterclaim fails. As Plaintiffs point out, a negotiable instrument under Delaware law must, among other elements, "contain an unconditional promise to pay a fixed amount in money,"[196] and the Second Round Notes contain conversion mechanics. I need not go further; Vistar's counterclaim for declaratory judgment fails.

Vistar's second counterclaim is for breach of contract. A breach of contract claim requires: "(i) a contractual obligation, (ii) a breach of that obligation by the

---

[194] 6 Del. C. § 3-104.

[195] *See* Def.'s Opening Br.; Def.'s Answering Br.

[196] *See Weinstein v. Luxeyard, Inc.*, 2022 WL 130973, at *5 (Del. Super. Jan. 14, 2022); 6 Del. C. § 3-104.

defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[197] Vistar's argument is that Plaintiffs were contractually required to *accept* repayment, an obligation they breached when they refused to accept repayment in 2017, which then caused Vistar's desired equity and debt financing with Edison and SVB, respectively, to fail. Accordingly, Vistar was damaged by being forced to borrow on relatively less favorable terms (which it needed to do to satisfy its settlement with Ozen). The causality and injury arguments are tenuous at best; however, I need not reach that far. I found (and reiterated in this Memorandum Opinion) that the language at issue was ambiguous; it was not a breach of contract to contest its meaning. Moreover, the language, even as Vistar interprets it, does not state an obligation on the part of the holder of the Second Round Note to accept repayment at any particular time or in any particular way. Vistar's real argument is that by maintaining this action, Plaintiffs have called into question its capitalization table, complicating borrowing. But Vistar has not pointed to an obligation that Plaintiff noteholders have breached here, upon which recovery may rest.

---

[197] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

### III. CONCLUSION

For the reasons stated, I have construed any ambiguity in the Second Round Notes to provide Plaintiffs with the right to repayment following maturity of the Second Round Notes. Accordingly, the declaratory judgment requested by Plaintiffs in Count I of their Second Amended Complaint is DENIED. The relief based on application of the implied covenant or reformation in Counts II and V is also DENIED. Counts I and II of Vistar's Counterclaim are also DENIED. The parties should confer and advise the court what, if any, further action of the court is required to resolve Plaintiffs' Second Amended Complaint, including the claims for estoppel,[198] as appropriate.

---

[198] In Counts III and IV of their Second Amended Complaint, Plaintiffs point to communications during the pendency of the Notes and after maturity, which they assert should amount to estoppel (either promissory estoppel or equitable estoppel). *See* Pls.' Answering Br. 35–37 (Plaintiffs providing examples of "representations, assurances, and promises throughout the negotiation and the life of the notes" and after maturity, although only one example relates to an interaction with a Plaintiff during the negotiation period, and such example is the provision of financial statements that reflected the Second Round Notes already issued up to that point as "Purchase of Stock"). The facts concerning these claims are as found in the Background section of this Memorandum Opinion. I reserve judgment on these claims.